## THE FIRST NATIONAL BANK OF CROCKETT

### *v.*

## THE GEORGE R. BARSE LIVE STOCK COMMISSION CO.

*Opinion filed October 25, 1902.*

1. ACTIONS AND DEFENSES—*when bringing of attachment does not bar other remedies.* The bringing of an attachment suit by a mortgagee to recover the proceeds of a sale of the mortgaged cattle, which suit is dismissed, upon the written stipulation of all the parties, without prejudice, does not preclude the mortgagee from claiming the fund upon interpleader by the commission company.

2. MORTGAGES—*acknowledging and recording of chattel mortgage not necessary as between the parties.* If a mortgagee takes possession of mortgaged chattels before any other right or lien attaches, his title under the mortgage is good against everybody, even though the mortgage is not acknowledged and recorded or the record thereof be irregular.

3. SAME—*possession by mortgagee's agent is sufficient.* If an agent of the mortgagee takes possession of the chattels by the latter's order such possession is sufficient, and it is not necessary the property be removed from the premises if the agent has full control.

4. SAME—*there is a change of possession when the mortgagee takes control.* There is a change of possession of mortgaged chattels whenever the mortgagee assumes control of the property, although the property is not removed from its location.

5. SAME—*what sufficient possession of mortgaged cattle by mortgagee.* If the mortgagee of cattle sends its agent to the ranch where they are pastured, and the agent notifies the mortgagor that he has come to take possession, they agreeing that the agent shall employ the former boss to look after them, who thereafter receives all his orders from the agent, who remains openly in possession, directs shipments and exercises sole control over the cattle, the latter are in the mortgagee's possession.

*First Nat. Bank* v. *Barse Live Stock Co.* 99 Ill. App. 198, affirmed.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. A. H. CHETLAIN, Judge, presiding.

ALDEN, LATHAM & YOUNG, for appellant.

PADDOCK & BILLINGS, for appellee.

Mr. JUSTICE HAND delivered the opinion of the court:

This was a bill of interpleader filed by Wood Bros. on June 16, 1898, against the appellant, the appellee, and A. H. Wootters and T. F. Smith, in the superior court of Cook county, asking the direction of the court in the disposition of $2397.47 in their hands, the net proceeds of a sale of one hundred and fifty-five head of cattle which had been shipped to them from Gibson Station, Indian Territory. On October 22, 1898, an interlocutory decree was entered in the cause sustaining the bill of interpleader, and decreeing that T. F. Smith and A. H. Wootters, who had each filed disclaimers, had no interest in the fund in controversy, ordering that the answers of appellant and appellee stand as interpleas or statements of their respective claims, and that the complainants deposit the fund, then amounting to $2334.47, with the clerk of the court, and that they be dismissed out of the cause, and upon the final hearing the issues were found in favor of appellee, and it was decreed to be entitled to the fund, which decree has been affirmed by the Appellate Court for the First District, and a further appeal has been prosecuted to this court.

The bill of interpleader alleged that complainants were engaged in the live stock commission business at the Union Stock Yards, Chicago; that on September 3, 1896, they received one hundred and fifty-five head of cattle from Indian Territory that had been shipped to them by A. H. Wootters; that said cattle were sold by them, as commission merchants, on the open market, and after deducting the expenses, commissions, etc., the sum of $2397.47 was realized; that an itemized account of sales was promptly sent to said shipper on the third day of September, 1896, and that they received a telegram from A. H. Wootters, dated Wagoner, Indian Territory, September 3, 1896, instructing them to remit the proceeds to the National Bank of the Republic, St. Louis, for account of H. F. Moore, cashier, Crockett; that on Septem-

ber 5, 1896, they received a letter from A. H. Wootters confirming said telegram; that said H. F. Moore, referred to in the letter and telegram, was the cashier of the First National Bank of Crockett; that the First National Bank of Crockett notified the complainants it was entitled to the proceeds of the sale of the cattle under an alleged chattel mortgage executed by one T. F. Smith; that on September 11, 1896, the Barse Live Stock Commission Company brought an attachment suit in the superior court of Cook county, cause No. 177,115, in which A. H. Wootters was named defendant and the complainants named as garnishees; that the said attachment suit was pending until June 3, 1898, when it was dismissed and complainants discharged as garnishees; that both the Bank of Crockett and the Barse Commission Company were claiming the money in the hands of complainants.

Appellant filed an answer and interplea, alleging that it was entitled to the fund in the hands of the complainants by the terms of an agreement entered into by T. F. Smith in August, 1896, whereby Smith, being the owner of the cattle in controversy, agreed to ship the cattle in the name of A. H. Wootters but for appellant, and thereby to assign and transfer to appellant the cattle in question for the purpose of taking up an indebtedness of said Smith to appellant, which was due September 1, 1896; that the cattle had been shipped, in accordance with the said agreement, for appellant; that the delivery of the cattle to Wootters was a delivery to appellant, and that appellant was entitled to the fund.

Appellee filed an answer and interplea, claiming to be entitled to the fund under the terms of a chattel mortgage executed by T. F. Smith to appellee on October 25, 1895, said Smith being a resident of Crockett, Houston county, Texas. The cattle were located in the Creek Nation, Indian Territory; that the mortgage was filed for record in Houston county, Texas, October 28, 1895, and on October 31, 1895, was filed in the office of the clerk of the

United States Court for the Northern District of Indian Territory, in accordance with the United States statutes, and that consequently appellee was entitled to the fund.

Three points are urged on this appeal as grounds for a reversal of the decree, two of them being questions of law and one a question of fact, viz.: (1) The prosecution of the attachment suit against Wootters by appellee was a bar to a recovery in this action; (2) the mortgage of the Barse company was void as against the rights of appellant that accrued on August 31, 1896; (3) at the time the cattle in controversy were shipped to Chicago they were in the possession of T. F. Smith, and not in the possession of the Barse company.

*First*—It is averred in the bill of interpleader that on September 11, 1896, an attachment suit was begun in the superior court of Cook county, wherein A. H. Wootters was made defendant and Wood Bros. were served as garnishees, for the purpose of reaching the proceeds of said cattle; that said attachment suit was dismissed June 3, 1898. The answer of both parties admitted the commencement of said attachment suit and its dismissal without prejudice on the date named in the bill, and the evidence shows that the suit was dismissed on the stipulation of the parties thereto. We are of the opinion the mere bringing of the attachment suit by the Barse company, which suit did not proceed to judgment but was dismissed upon written stipulation without prejudice, did not constitute an election, nor estop the Barse company from setting up its claim to the fund in this case. In *Gibbs* v. *Jones*, 46 Ill. 318, it was held when an action of trover is brought, an action in assumpsit between the same parties, brought to recover the value of the property and which was dismissed without prejudice, cannot be specially pleaded in bar of the action of trover. And in *Flower* v. *Brumbach*, 131 Ill. 646, it was said: "The circumstance of a party having elected one of several remedies by action will not, in general, preclude him from

abandoning such suit, and after having duly discontinued it he may adopt any other remedy." To the same effect are *Stier* v. *Harms,* 154 Ill. 476, and *Barchard* v. *Kohn,* 157 id. 579. In *Johnson-Brinkman Commission Co.* v. *Missouri Pacific Railway Co.* 126 Mo. 344, (47 Am. St. Rep. 675,) it was held an attachment suit brought by a vendor of personal property against his vendee, if dismissed before final judgment, does not estop him from subsequently maintaining an action of replevin to recover the chattels, in the absence of any intervening rights, injury or change of position by reason of the attachment.

The word "election," as applied to remedies, is but another term for "estoppel." There is no element of estoppel by record, as the attachment suit was not prosecuted to judgment; and there is no estoppel *in pais,* for neither Wootters nor the bank has taken such action, in consequence of the suing out of the attachment, that they will receive detriment, in a legal sense, from the conduct of plaintiff. There were no intervening rights in the case from the time of suing out the attachment until suit was dismissed. Nor does it appear that the bank was, by reason of the commencement of said suit, induced to change its position with respect to the fund in controversy. If the attachment suit had proceeded to judgment, or there were intervening rights, or the position of the parties, by reason of the commencement of the suit, had been changed, a different question would be presented; but it having been dismissed upon the written stipulation of all the parties, without prejudice to the rights of any of them, all are in the same position they would have been if the suit had never been begun.

*Second*—Prior to the recording of the mortgage Congress had extended the laws of the State of Arkansas over the Indian Territory, including the law in relation to the acknowledging and recording of chattel mortgages. It seems that the statutes of that State in express terms did not provide for the recording of chattel mortgages

in cases where the mortgagor was a non-resident of the State, which defect was attempted to be cured by an act of Congress approved February 3, 1897. The consideration of the effect of said curative act becomes wholly immaterial if the Barse company had taken actual and open possession of the cattle covered by its mortgage prior to the time when the rights, if any, of the bank accrued, which question is involved in appellant's third proposition.

*Third*—The trial and Appellate Courts both held that the appellee had taken actual and open possession of the one hundred and fifty-five head of cattle in controversy prior to their shipment to Chicago, and from a careful examination of the record, which covers more than nine hundred pages and is mainly made up of testimony bearing upon that proposition, much of which was heard in open court by the chancellor, we are inclined to agree with the finding of said courts. The mortgage was for $35,254.91, bore date October 25, 1895, and described the property as situated in the Creek Nation, Indian Territory, viz.: "Twenty-one hundred head of steers of the ages of three years and upwards, each and all bearing some one of the following brands, namely: 7W on right side of loin; O7 on left side; LM on left side, and X on the left side, being and including the entire lot and number of cattle owned by me, all said cattle now located in my pastures near Wagoner, Creek Nation, Indian Territory, and to be fed and grazed in said Creek Nation until shipped to the order of said George R. Barse Commission Company;" and the appellant admits that the one hundred and fifty-five head of cattle in question were included within the above description and covered by the chattel mortgage. The pastures mentioned in the mortgage had been leased by Smith from the owners. They were fenced, and comprised something like 40,000 acres of land, and were occupied by the cattle of T. F. Smith and Smith & Jones. The mortgage contained the

usual insecurity clause, empowering the mortgagee, in the event of the mortgagor selling or attempting to sell the mortgaged property, or to remove or attempt to remove the same, or in the event of the mortgagee feeling itself insecure, to enter upon the premises, or any other place where the mortgaged property might be found, and to remove and dispose of the same.

Prior to the execution of the mortgage, Stonebraker, the agent of the Barse company, went to the Indian Territory, and in company with Smith made an examination of the cattle. He and Smith then returned to Kansas City together and the mortgage was executed and recorded. In the month of May, 1896, Stonebraker made another trip to the Territory for the purpose of investigating the various securities held by the Barse company upon cattle located in that Territory, and while there examined the Smith cattle. He testified with reference to the result of such examination and what followed, in open court, as follows: "It did not seem to me there was as many as twenty-one hundred head of 7W and O7 in the pasture, although I could not tell. * * * When I returned to Kansas City, in June, I had a conversation with Mr. Waite in regard to the cattle, and I think, possibly, with Mr. Barse also. I told them it didn't seem to me there was twenty-one hundred of Smith cattle in the pasture. * * * Some time the fore part of July I was in Wagoner again, but only for a day. I went through the Smith pasture and then returned to Kansas City, and was there a day or two, and then returned to Wagoner and remained there until fall. It was the latter part of July. I got a horse and went through the Shannon and Edwards pastures and made an examination, and became convinced that the Smith cattle were four hundred or five hundred short. I then reported to the Barse company what I had found in reference to the cattle."

In this statement Stonebraker is corroborated by the testimony of Joseph H. Waite, who was secretary and

treasurer of the Barse company in the years 1895 and 1896. He says: . "In June, 1896, I sent Mr. Stonebraker out on an inspection of the various loans the Barse company had, and he reported the condition of this loan, and I told him to take such measures as were necessary to protect the interest of the Barse company. * * * I sent Stonebraker on a tour of inspection in May or June, 1896. It was, I think, about the middle of July that I gave him instructions to protect the interest of the Barse company. I gave him this instruction because he had reported he thought the loan was not altogether satisfactory. * * * The reason why it was necessary for me, in the middle of July, to repeat these instructions was, that he had reported this loan needed looking after. He stated he thought the cattle were not all there. * * * I believe this very thorough inspection was made in July. * * * The reason why I did not act earlier was, as I have stated, Stonebraker did not report positively they were gone, but he had a suspicion."

Stonebraker further testified that after he had made the final inspection of the cattle and discovered the shortage he went back to Kansas City and informed Mr. Waite, and then returned to Wagoner and remained there. He says: "When I returned I went to the ranch and saw Mr. Redman, (the foreman of T. F. Smith and Smith & Jones,) and asked him if we could employ him. I returned to Wagoner at the first of August, or a day or two before the first, at the last days of July. There was nobody present when I talked with Redman. * * * I put Redman in charge of these cattle right then and there, and he began acting from that day forward for the Barse company, as their agent, under my instructions. I saw T. F. Smith after that, about the middle of August. * * * It is my recollection that he was not on the ground until two weeks after I took possession. Still, he might have been. As I stated yesterday, my recollection is that he did not get there until about the 15th

or 18th of August, and that is my recollection now, and still it is possible he was there sooner. When Smith came in, about the 15th or 18th of August, I had a conversation with him. He came in on the night train and went immediately to the ranch the next morning. I was informed by some one that Smith had come in on the night train and had gone out to camp early in the morning, and I went out immediately and told him what I had done, and he didn't seem to be very well satisfied with it at first. Redman was present at the time. We talked the matter over and then went back to town. Before we left we made a verbal agreement after we talked the thing over, and Smith consented to it. He first allowed that it would injure his credit, and this, that and t'other, and there was plenty cattle there, and I needn't have been uneasy, and afterwards we went back to town. He consented to put Redman in charge of the cattle. He wanted to put Albert, his son, in charge, and he took me off from Redman and said to just put Albert in charge of the cattle; Albert would do anything I wanted him to; Albert would make the best man. I told him that I preferred to have Redman. I informed Smith in the beginning that I had taken charge of the cattle under our mortgage, and he thought it was all unnecessary, and told me there were lots of cattle in the pasture. I told him there didn't as many cattle show up as he claimed. Smith was finally satisfied to leave Redman in control of the cattle. * * * Smith didn't want Redman there. He wanted to get rid of him and let Albert Smith take charge of them. I would not agree to Albert Smith taking charge of the cattle. Then Smith finally said: 'If nothing else will satisfy you, all right. You needn't be scared; you will get all your money,—plenty cattle to pay you.' There was one thing more: he was afraid it would get out and everybody would find it out and it would injure him in business, and he requested that it be kept still,—not let anybody know it. I think he came to

me a second time about that. He didn't want the public to know that I had taken possession of the cattle, as he claimed it would injure his credit, and that he would thoroughly satisfy me, before we got through, that it was not necessary.

Q. "State whether or not you made any effort to conceal it from the public.

A. "I did not. Mr. Edwards notified me the day I had taken possession of the cattle. How he found out I do not know. He took me in the parlor of the hotel and said he understood we had taken possession of the Smith cattle, and that he wanted to notify us he had a pasture bill against those cattle and that they could not leave the pasture until that was paid. I assured Mr. Edwards the bill would be paid. I told him that Smith was going to owe us a little money, and to get Smith & Jones or Smith to pay it, if he could. The Barse company did pay it. They paid every dollar of pasture. Edwards controlled the Shannon pasture, and T. F. Smith's cattle were kept in that pasture.

The court: "State what was done by you or by Redman, if you say you hired him, in the early part of August.

A. "We went ahead shipping the cattle out. I was then boarding at the hotel. I was out to the ranch every day. I helped at all the round-ups. I think we made a shipment the next day or two out of these cattle. I would assist in shipping and cutting the cattle out of the bunch, and kept on right along in that way. Redman ran the outfit. I think I was there for most every shipment of the Smith cattle after that time. I know the Smith boys got very angry with me when they found out I had taken charge of the cattle. * * * I told them I had put Redman in possession of the cattle, and they kept getting up a worse racket with Redman, and with me, too; even went so far as to get their six-shooters, and sent me word if I came out there any more they would fill me full of lead, but after Mr. Smith came the boys

got quiet and a horse was furnished me from the ranch.
* * *   When I was not personally superintending the
shipments, during August, Redman represented the Barse
company in my absence.   He remained in the employ
of the Barse company, as its foreman in charge of the
Smith cattle, until October,—until all the Smith cattle
and Smith & Jones cattle had been shipped out and the
camp broken up.   The talk I had with the Smith boys
first was in the next day or two or four or five days after
I employed Redman.   * * *   Smith, after the conver-
sation with me, finally acquiesced in my position and
went immediately back to Texas.   He didn't stay only
a day or two.   He made a very short stay.   * * *   When
I returned to Wagoner after reporting the matter to the
Barse company, in the latter part of July, I had a talk
with Mr. Jones, but could get very little satisfaction out
of him.   All he would say was, that Smith wanted to
fire Redman, and that it would never do to let Redman
go, for the Smith boys would steal the whole thing be-
fore fall.   * * *   It was agreed between Jones and I·
that Redman should take charge of everything, including
the Smith & Jones cattle.   That arrangement was made
between us at the Brown Hotel, in Wagoner.   We got
together and talked the situation over, and decided that
we would have trouble with Smith, and that it was better
to put Redman in charge of everything; that Smith owed
money, and his creditors were liable to give us trouble.
* * *   I think Mr. Jones and I rode out to camp and
told Redman we had put everthing in his charge, and
that he should handle the cattle subject to my directions.
* * *   I had a certified copy of the Smith mortgage
with me that was offered in evidence here, and read it to
Redman and the Smith boys.   Jones was to have nothing
to say about the T. F. Smith cattle.   The expense of
running the T. F. Smith cattle was prorated, and part
of it was charged to Smith & Jones' account.   * * *   If
a person had come there and inquired they could have

found out about the possession of those cattle. There were no sheds or protection of any kind for the cattle. There was nothing to do with these cattle except to round them up and cut out the beef cattle whenever we wanted to make a shipment. By rounding-up I mean going out into the pasture, getting all the cattle together and driving out such cattle as were fit and ready for shipment. After the first of August I had general charge of rounding-up the cattle."

Redman testified: "Am not in the employ of the Barse company and have no interest in their affairs. Became acquainted with T. F. Smith at Wagoner in the fall of 1895. Was employed by him as boss, running his outfit. Began work on the first day of November, 1895. I had five other men under me—I think seven part of the time. I went from one bunch of cattle to another, to see they were all fed and taken care of. I attended to the pay-roll of the men. In April, 1896, I began working for Smith & Jones. I had charge of both outfits. I met Stonebraker on May 12, 1896, at Wagoner, when he came there to look after the cattle. The next time I saw him was in June. I was T. F. Smith's foreman at that time, looking after his cattle. The brands on the cattle I had charge of for Smith were O7 and 7W. There were other cattle I had charge of, known as Smith & Jones cattle. I had charge of these cattle from the first of November, 1895, up to the first of August, 1896. I was in the employ of Smith from the first of November, 1895, up to the first of August, 1896. I was going to quit, when Stonebraker came down and said to me he didn't know how things were going and asked me if I would work for him, and I said I didn't know but what I could, and he then said he would let me know in a few days. And in a few days after that, him and old man Smith came out to the ranch together and made this talk to me. * * * Stonebraker came there at the time he employed me to watch out for the Smith cattle for the Barse company's interest. * * *

They came out there and called me out, and we walked towards the saddle house, twenty or thirty feet from the ranch, and sat down on some salt barrels, and Stonebraker said he had decided to take possession of these cattle and ship the stuff out, and Smith said to Stonebraker, 'It will ruin me to ship this stuff out,' and Stonebraker said he was not going to ship it all out at once; he would ship just a few at a time and no one would know anything about it. Smith then consented that I should work for Stonebraker and have control of these cattle. He said he wanted the Barse company to get their money out of the cattle and was willing I should be put in control. I was to get my orders in regard to these cattle from Stonebraker. Up to this time I had had orders from J. B. Jones or T. F. Smith. About August 15 Stonebraker, Smith and Jones all came out from town one afternoon, and we walked over to a little shed made for hitching horses, and Stonebraker told me he had put me in control of the Smith & Jones cattle. Old man Smith spoke up and said he would rather Albert Smith, his son, be in charge of the cattle, and Jones refused to listen to that, and said he would rather have an outside person that would be fair to all parties, and then Smith consented that I should be put in charge. It was about August 15 that I was put in charge for the Barse company, and after that I had no orders from anybody except Stonebraker. Jones was around there most of the time, but he never gave any orders.

Q. "Now, Mr. Redman, is it not a fact that whatever instructions you got about keeping things secret were from Smith & Jones, and not from Stonebraker?

A. "Yes, sir; Mr. Smith was the man that told me not to say anything about it."

Christopher E. Horn testified: "I was working for the railroad company, loading stock, in the summer of 1896. Stonebraker was here the biggest part of June, July and August. He seemed to have charge of the Smith & Jones

cattle all the whole time,—all through August. He was with them, working very hard; appeared to be leading the outfit. When there was any of them shipping he would order cars and would instruct me when there was any to ship, how many cars, and what time they would be loaded. That was in August. The principal part of the shipping was done in August. Redman was working with the gang. He was getting the majority of his instructions and orders from Stonebraker during shipping time. I was with him when they were shipping and branding—during the whole summer. I helped in every one of those shipments during the month of August. Most all of the shipments were made to Barse.  *  *  *  The bulk of the cattle were shipped out in August—more than one hundred cars went out in August.  *  *  *  It took all the way from five men up, to handle these cattle. Stonebraker, when he was here, was very frequently out on a horse at work with them. When Stonebraker was there he was the principal boss. He gave orders for shipping. I understood he was representing the Barse company. I knew that when he first came here, and I knew he was taking charge of the Smith & Jones and T. F. Smith cattle, and had charge of them early in August. He went along and helped work them, and did the ordering of the cars. He did this right along in August, and made no secret of it. He had charge of them early in August, open and above board. He went right with them and helped work them. He did the ordering of the cars. Acted as a man would who had absolute title to the property. Never made any secret of it. Handled the cattle just as if they were his own. That was all through August."

Nolan Williams, a cattleman living one mile west of Wagoner, testified: "I knew the T. F. Smith and Smith & Jones cattle in the summer of 1896. I worked with them. They were in adjoining pastures. I worked with them, off and on, during the summer season. I was work-

ing for myself. My cattle would get out, and I would attend the round-ups in their pasture and get mine back. I was with them very often all summer. I knew Mr. Stone-braker and saw him in the summer of 1896. The first time I saw him was along in June. He and Smith were together. Mr. Stonebraker was around there after that. The first of my knowing of Stonebraker assuming control of the Smith cattle was, I think, along in August or the latter part of July. I asked Redman one day when he was going to ship, and he said he could not tell me; that the business had made a change and I would have to see Stonebraker. Another time I had a talk with Stone-braker about shipping. That is about all I know; that I heard the Barse company had taken charge of the cattle, and I would see Stonebraker out there at the round-ups. * * * He seemed to be giving orders about shipping—how many to ship. To the best of my recollection that was along in August. * * * I saw Stonebraker first in June, maybe in July. Redman told me he had charge of the cattle for Stonebraker the latter part of July or along in August. Nobody else in particular told me he had charge of them for Stonebraker, but I could hear it around the country there. Stonebraker told me. I went to Stonebraker and asked him when he was going to ship. He said he could not tell me, but would let me know. It was about the middle of August."

E. E. Baldridge, who was in the cattle business near Wagoner, testified: "Redman had charge of the cattle. I know Stonebraker was giving orders concerning these cattle, and I think he was giving orders in August, 1896. I know that Redman was following his instructions and that Stonebraker was acting for the Barse company. It was a matter of general understanding. First knew these cattle about the first of April, 1896. Was with them and around them in the pasture. Had cattle in their pasture and they in mine. We worked together. About August, 1896, Stonebraker was exercising about the same control

over these cattle that I took over my business. Stone-braker was bossing the round-up and handling the cattle, and doing things about the same as I do my business. His actions were stronger in this case than ordinarily where his company had a large mortgage on property. I do not think that he would take that much authority of a man's business that he had not taken charge of. At the time I have referred to he was exercising absolute control over these cattle. He exercised such control as I would have exercised over them had they been my own. Smith Redman was foreman. * * * I do not think it could have been as late as the first of September that I saw Stonebraker there in charge. I think it was about the middle of August. Stonebraker was openly giving orders about these cattle about the 15th of August, 1896, as I remember, and made no secret about it. Others were present at the time when Stonebraker was giving directions. The outfits were there,—Stone-braker's outfit,—and, as a rule, some of my men. There was some of that outfit there all the time, and I was satisfied that they knew Stonebraker was in charge of the cattle at that time. I do not remember but I spoke or talked to people in town about Stonebraker being in charge of the cattle. There was some talk around town about it among cattlemen, and it was pretty generally known that Stonebraker was in charge of those cattle for the Barse company."

H. G. Ezell, who was engaged in the cattle business in 1896, testified: "My ranch was near the ranch operated by Smith & Jones. The ranches were about one and a half miles apart. I was handling cattle there during the entire season of 1896, and had about fifteen hundred head. I have known Stonebraker since the fall of 1895, and knew he was in the employ of the Barse company in 1896. He was their Texas representative at that time. I saw him at my ranch in Indian Territory in May, 1896. After that I saw him all through the year. He was there

in Smith & Jones' pastures most of the time along in July,—from that until October,—until the Smith & Jones cattle were all shipped out, so far as my observation went. Smith & Jones run my cattle. What we call 'run,' unloaded them and loaded them back, with the understanding that I was to work through and through with them. When I was to ship they would send the outfit over and help me to ship, and whenever they were working I always had to go and help them do the rounding. By 'outfit' I mean the wagon and men who are helping ship the cattle. We worked through and through. By 'through and through' I mean both outfits worked together.

Q. "Now, then, you say that Mr. Stonebraker came there in July and remained from that time on?

A. "To the best of my knowledge it was right along there. I heard that Stonebraker had taken charge of the cattle, and I went over there and Stonebraker told me himself he had taken charge, and Redman, who had been hired by Stonebraker to take charge of these cattle. To the best of my recollection that was in August. I am not positive whether it was before or after the middle of August. I am satisfied it was prior to the latter part of August and prior to the shipment of the one hundred and fifty-five head to Chicago in the name of A. H. Wootters. At the times I saw Stonebraker he issued orders to the foreman when he wanted any cattle shipped. I went to him once or twice myself when I wanted my cattle shipped, and know he had charge of everything. I asked him when I could have the outfit to come over and help me work my cattle. It looked to me as if Stonebraker gave orders and Redman took his orders from Stonebraker. Redman himself told me he was under Stonebraker. Whenever they were working Stonebraker was there. I mean by 'working,' rounding-up or shipping. I saw him over there lots of times when I was there driving. * * * Stonebraker had charge of the cattle when

the marshal ran an attachment on them, and I had a talk with Stonebraker before that.  \*  \*  \*  I helped round-up most all of the shipments from the T. F. Smith pasture in August.  Stonebraker directed these shipments. I never heard J. B. Jones directing any of them, nor T. F. Smith.  After Stonebraker took charge he made the shipments.  \*  \*  \*  Stonebraker's management and actions in connection with T. F. Smith cattle was different from mine and Gibson's.  He exercised a different direction and control over the Smith cattle than he did over any other cattle there in that vicinity on which the Barse company had mortgages."

A. H. Jones testified: "Stonebraker was here all summer.  The man that was handling the cattle was Smith Redman.  I don't know who Redman was acting for.  I guess Stonebraker was representing the Barse company. He told me he was, and was looking after these cattle. My recollection is that it was in July or August."

Charles Lacey testified: "I live at Wagoner.  I have been in the cattle business seven years.  I knew the Smith cattle.  I knew Stonebraker in the summer of 1896 and that he represented the Barse company.  He staid here some time in the summer and superintended these cattle and shipped the most of them.  The biggest shipments were in August or September.  He was at some of the round-ups and at some of the shipping.  He gave instructions and orders.  I asked him several times when he was going to ship, during the shipping season.  I did a good deal of shipping in August and finished in September.  Stonebraker was shipping when I was."

S. H. Merchant testified: "I live in Wagoner and was in the cattle business in 1896.  I knew Stonebraker.  I understood he took charge of that business some time in the shipping season.  I understood he was acting for the Barse company.  When he was here he would go out two or three times a week and have those cattle rounded-up and shipped out according to his orders.  Redman was

boss of the ranch.  He seemed to work under Stone-
braker's orders.  Whenever we wanted to find out what
time they were going to round-up we always asked Stone-
braker.  Smith was not here very much.  Jones was here
part of the time, but they both left here.  *  *  *  I did
not begin shipping until August, and when I was ship-
ping Stonebraker was shipping.  I knew the cattle were
going out, and he was there and seemed to be managing
it.  *  *  *  Stonebraker was here, off and on, all through
the spring and summer season, and the first thing any-
body here knew he came here and took charge of the
cattle.  Everybody knew it.  I have an idea I got it from
hearing it said around here that Barse had loaned money
on these cattle and had taken charge of them for his
protection.  I think it must have been about the 15th of
August.  Even prior to August 15 it looked to me as if
Stonebraker was out there taking charge and control
and directing the movements of those cattle."

J. C. Knight, agent for the Missouri Pacific Railway
Company at Wagoner, testified, on cross-examination:
"I saw Stonebraker around here previous to June, 1896,
and after that I saw him at different times.  My recol-
lection is that shipping began in August,—perhaps the
latter part of July.  I knew Mr. Stonebraker was the
representative of the Barse company, and as such was
looking out for their interest.  He ordered some cars
from me for these cattle."

While the testimony was conflicting and T. F. Smith
denied that Stonebraker took possession of the cattle for
the Barse company, we think the testimony, when consid-
ered as a whole, tends strongly to show that on or about
the first of August, 1896, appellee, through Stonebraker,
took possession of all of the T. F. Smith cattle covered
by appellee's mortgage.  But, regardless of whether or
not all of the cattle were taken possession of at that
time, we think the evidence conclusively shows that ac-
tual possession of the one hundred and fifty-five head of

cattle involved in this suit was taken by the Barse company in the month of August, and some time prior to the 31st of that month, the time of the shipment to Chicago. These particular cattle were separated from the balance of the herd and put in a separate enclosure, known as the "horse pasture," adjoining the headquarters of the ranch, convenient to and from one-half to three-quarters of a mile from the railway station, for shipment, where they were to remain until Stonebraker should direct them to be shipped. After they had been thus separated, and while Redman and Stonebraker were temporarily absent, two sons of Smith went to the horse pasture and drove those one hundred and fifty-five head from there to Gibson Station, some six or eight miles distant, and there shipped them to Wood Bros. in the name of A. H. Wootters. On that point Redman testified: "I remember about the shipment of the one hundred and fifty-five head of cattle from Gibson to Wood Bros. in the name of A. H. Wootters. On Friday I rounded-up the T. F. Smith cattle and cut seven or eight car-loads and throwed them into the horse pasture, right back of the ranch. Stonebraker ordered me to ship one load to Chicago and one load to St. Louis. After I had cut out the O7 and 7W cattle [the one hundred and fifty-five head] and started across the river to the Marshall pasture Smith was there, and I told him what I was doing, and he went to town and said he was going to take the twelve o'clock train to Texas. That is the last I saw of him. I worked in the Marshall pasture until Sunday evening. On Monday we rounded-up the Smith & Jones cattle, * * * and when I got back to the ranch on Monday afternoon the O7 and 7W cattle were gone. * * * I employed a shipper to trace the cattle, and he overtook them on the road, where they had stopped to feed. The reason I do not personally know about these cattle is because I was across the river, six or seven miles from the ranch. The ranch is right close to Wagoner, and those O7 and 7W cattle [the

one hundred and fifty-five head] were in the pen probably a half mile from town, and I understand they were taken out of the pasture and driven to Gibson Station and shipped from there.  When I finished loading out I went to town and met Stonebraker and told him about it, and he asked me where old man Smith was, and I told him he had taken the train for Texas.  I was in charge of those one hundred and fifty-five head of cattle at the time they were shipped to Wood Bros., in Chicago.  I gave no one permission to remove them.  I got no orders from Stonebraker to ship those cattle to Wood Bros. in the name of A. H. Wootters, nor from any other person, and I didn't instruct any of my men to ship them to Wood Bros. ꞏ The horse pasture is not over half a mile from the Wagoner pens, where we shipped.  Wagoner is the natural shipping point from that horse pasture.  Gibson Station is from six to eight miles from the horse pasture."

Stonebraker testified that after the Barse company took possession Smith returned to Texas, where he resided.  "The next time I saw him in Wagoner was the day before these cattle were shipped to Chicago.  He came in on the 28th of August, I think it was,—on the night train.  It was on Saturday night.  I met him at the hotel and had a talk with him.  I told him we had Redman across the river then, cutting out a load of the J7 cattle to ship on Monday or Tuesday, and had six or seven loads of the wintered cattle cut out and in the horse pasture.  The wintered cattle were the T. F. Smith cattle.  Smith asked me where we were going to ship, and I told him. St. Louis.  He asked me why we didn't ship to Kansas City.  I told him that when Redman came in we would ship some to Kansas City if he thought they would sell better there.  On Sunday I decided to make a little shipment to Kansas City, and we loaded a couple of cars and I got on the train and came home to Kansas City.  Smith informed me that he was going to Fort Worth and then up to Archer, Texas.  The cattle I took

to Kansas City were none of the cattle we had previously put in the horse pasture. This horse pasture is a little pasture right near Wagoner—not over three-quarters of a mile away. I returned from Kansas City Tuesday night, September 1. Redman met me at the depot and told me some of the cattle we had cut out were gone; that Smith had had the boys ship them; that Tom and Jim had driven them to Gibson Station. I rode out to the camp and asked Jim Smith what he meant by shipping those cattle, and he said: 'Go ask somebody else; don't ask me about it.' Next morning I went to Gibson Station, saw the agent, and he told me the Smith boys had brought the cattle there. I made some inquiries of other parties and found that the brands were O7 and 7W. I went back to Wagoner and wired the Barse company to stop the cattle at Chicago; that they were shipped in the name of A. H. Wootters to Wood Bros."

If a mortgagee take possession of mortgaged chattels before any other right or lien attaches, his title under the mortgage is good against everybody, although it be not acknowledged and recorded or the record be ineffectual by reason of any irregularity. (*Chipron* v. *Feikert*, 68 Ill. 284; *Frank* v. *Miner*, 50 id. 444; *McTaggart* v. *Rose*, 14 Ind. 230; *Brown* v. *Webb*, 20 Ohio, 389.) Subsequent possession cures all such defects. (*Morrow* v. *Reed*, 30 Wis. 81.) No particular mode of taking or retaining possession is required. It is not necessary that the property be delivered to the mortgagee in person—delivery to his agent is equally effectual. No removal of the property from the mortgaged premises is essential if the mortgagee has actual control of it there. (Jones on Chattel Mortgages, sec. 180; *McPartland* v. *Read*, 11 Allen, 231.) What constitutes a change of possession depends much upon the character and situation of the property. If it be in the possession or charge of a third person, a substantial change of possession may be made by the mortgagor's pointing out the property and the mortgagee's

constituting such third person his agent, who agrees to hold it for him. In such case there is a change of possession without a change of locality. (Jones on Chattel Mortgages, sec. 182.) There is a change of possession whenever the mortgagee assumes control of the property, although there be no removal of the property from the place it has before occupied. Thus, if a mortgagee of a stock of goods receives a delivery of them and puts a third person in charge, who carries on the business and accounts to the mortgagee for the money received, there is an actual change of possession of the goods. (Jones on Chattel Mortgages, sec. 184.) If the property be in the possession of a third person an immediate delivery is not necessary. If such third person consent to hold the property as the agent of the mortgagee, the necessity of any delivery to and possession by him is superseded. Jones on Chattel Mort. sec. 183; *Smith* v. *Post,* 1 Hun, 516; *Goodwin* v. *Kelly,* 42 Barb. 194; *Nash* v. *Ely,* 19 Wend. 523; *Doak* v. *Brubaker,* 1 Nev. 218; *Wheeler* v. *Nichols,* 22 Me. 238.

From an examination of the above authorities it clearly appears if the mortgagee, through his agent, have the property in his view and under his control, and by exercising control over it by virtue of his mortgage indicate an intention of depriving the mortgagor of his apparent ownership and possession, it is sufficient to protect the property from the claim of third parties. Tested by this rule, the facts in this case, in our opinion, clearly show that the appellee, through Stonebraker, took such actual possession of the one hundred and fifty-five head of cattle in controversy as answered every requirement of the law, and the appellee could not be deprived of such possession by the wrongful seizure of the property by Smith or his agents on behalf of Wootters or the bank.

Finding no reversible error in this case the judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*