## Nicholas Martin v. Patrick J. Sexton.

### Gen. No. 10,909.

1. CONTRACT—*when a, in the nature of a chattel mortgage, is valid as between the parties.* An agreement substantially a chattel mortgage, although neither acknowledged nor recorded and although it gives to the debtor the right to retain possession of the property covered thereby and sell the same in the usual course of business, is, nevertheless, good as between the parties thereto, and as between such parties a provision therein covering after-acquired property is, likewise, valid.

2. CONTRACT—*when a, in the nature of a chattel mortgage, is valid as to third parties.* Such an agreement as that referred to in the preceding paragraph of this syllabus is valid as to third parties, having no prior lien, after possession has been taken thereunder.

3. POSSESSION—*what is a sufficient taking of, under an unrecorded chattel mortgage.* Where a creditor, after the lapse of some time after the execution of an agreement such as that referred to in the first paragraph of this syllabus, agrees with the debtor in such agreement that he will take possession thereunder and hold the same through the bookkeeper then in the employ of such debtor; and where such bookkeeper

is informed of the agreement under which such possession is taken and of her duties, and where such bookkeeper did, pursuant to such agreement and in accordance with her verbal instructions from the creditor, assume control of the business, reorganized a portion thereof, told the manager thereof to report to her, took charge of the cash, paid the bills, deposited in bank, refused to permit the debtor to take out any money, and reported all these matters to the creditor under such agreement, and acted generally under his orders and directions; and where such creditor himself visited the place of business daily, examined the accounts, consulted with his custodian and gave directions concerning the business; and where all of these facts were known to a contesting chattel mortgage creditor, there was such a taking of possession pursuant to such agreement or unrecorded chattel mortgage, which was, likewise, sufficiently notorious, as to protect the rights of the creditor under such an agreement.

4.  CHATTEL MORTGAGE—*when a, is void.* A chattel mortgage, running to the mortgagee as "trustee" (without indicating for whom, if anybody, such mortgagee is trustee), is void as to a third person, where the mortgagor was not in anywise indebted to the mortgagee and such mortgagee was an entire stranger to the transaction and had no interest therein; in such case the word "trustee" is merely *descriptio personæ.*

5.  GENERAL PRAYER FOR RELIEF—*when, sufficient.* Under the particular facts of this case, held that if the allegations of the bill were sufficient, the general prayer for relief would be sufficient to entitle the complainant to the relief afforded by the decree.

6.  SUPPLEMENTAL BILL—*when, not essential.* Where no new facts have arisen since the filing of the bill, except that the defendant afterwards continued to do what the bill alleged he was doing and about to do, a supplemental bill is unnecessary.

7.  EQUITY—*of what, will take jurisdiction.* Where a creditor, pursuant to an agreement in the nature of an unrecorded chattel mortgage, has taken possession of the business of his debtor, is running the same and receiving the profits therefrom, and where another creditor of the owner of such business, pursuant to a recorded chattel mortgage, forcibly takes possession of such business and the tangible property thereof, a remedy exists in favor of such first mentioned creditor.

8.  REMEDY AT LAW—*when objection that a, exists, should be raised.* An objection to the effect that the complainant has a remedy at law should be taken at the earliest opportunity.

9.  VERBAL LEASE—*right to transfer right of possession acquired by.* When a lessee is in possession of premises under a term created by a verbal lease by which no restriction is placed upon his right to assign or sublet, such lessee may give to another the right to occupy such premises and so long as the rent is paid pursuant to such verbal lease, such lessor cannot oust such occupant or sub-lessee.

Bill for an accounting. Appeal from the Superior Court of Cook County; the Hon. AXEL CHYTRAUS, Judge, presiding. Heard in the

Martin v. Sexton.

Branch Appellate Court at the October term. 1902.   Affirmed.   Opinion filed February 13, 1904.

Statement by the Court.   This is an appeal from a decree upon a bill filed July 23, 1897, by appellee against appellant, A. H. Blackall & Son, a corporation, A. H. Blackall, E. S. Blackall, L. M. Blackall and J. B. Gascoigne.

The bill sets up that the corporation (hereafter called the company) and the three Blackalls to secure their indebtedness to appellee of $5,386.65 made with him the following agreement, to wit:

"This indenture, made this twenty-second day of September, A. D. 1896, between A. H. Blackall & Son, a corporation, A. H. Blackall, E. S. Blackall and L. M. Blackall, all of the County of Cook and State of Illinois, parties of the first part, and P. J. Sexton of said county and state, party of the second part, WITNESSETH:

"That WHEREAS the said parties of the first part are now the possessors and owners of certain accounts, bills receivable and accounts receivable, a list of which is hereto attached and marked 'Schedule A'; and whereas said parties of the first part are the possessors and owners of certain stock, coffees, teas, store fixtures and other merchandise, property, goods and things of value, set forth in Schedule B,' hereto attached;

"AND WHEREAS said parties of the first part are engaged in the operation, control and management of a certain tea and coffee business, being carried on at No. 105 Madison street, in the City of Chicago;

" AND WHEREAS said parties of the first part are now indebted and owe to said party of the second part the sum of five thousand three hundred and eighty-six dollars and sixty-five cents ($5,385.65);

" Now THEREFORE, the said parties of the first part hereby grant, convey and confirm to said P. J. Sexton all and singular said property described and set forth in Schedules A and B, the intention of these presents being to convey absolute title in and to said property and rights, to said P. J. Sexton, said property and rights to be defeated only upon the condition hereinafter set forth.

" And said parties of the first part agree to manage, conduct and carry on said business at their own expense, and to turn over to said P. J. Sexton all profits arising therefrom from time to time, as they accrue, save and ex-

cept only that said A. H. Blackall, E. S. Blackall and L. M. Blackall shall be allowed to withdraw from said business or the profits thereof, the sum of two hundred dollars ($200) per month; and the said P. J. Sexton agrees for the present to allow the said parties of the first part to retain said property mentioned in Schedule B, hereto attached, for the purpose of carrying on said business, until such time as he, the said P. J. Sexton, shall deem it expedient to take said property into his possession.

" And the said parties of the first part agree to carry on said business at their own expense and risk, and the said P. J. Sexton shall not be responsible for any loss, indebtedness or charge for the carrying on of said business.

" And the said parties of the first part may sell the stock of teas, coffees, goods and merchandise from time to time, provided they replenish and replace the goods and merchandise so sold with others of like quality and quantity; and the teas, coffees, goods and merchandise so supplied in place of that sold shall be the property of the said party of the second part.

" And the said party of the second part shall have at all times free access to the store and premises, books and accounts of said business, and a regular statement shall be made at the end of each month, or oftener, under oath, showing the condition of said business; and as often as a statement is made the accrued profits shall be at once paid over to P. J. Sexton. And said P. J. Sexton shall have the right at any time to enter said premises and take possession of the same, and move and sell and dispose of said property, and take the same into his own use and possession without notice, provided that if the said parties of the first part shall, on or before the 22nd day of March, A. D. 1898, pay to the said P. J. Sexton the sum of five thousand three hundred and eighty-six dollars and sixty-five cents ($5,-386.65), then and in that case the property, goods, merchandise, and rights described in said ' Schedule B,' hereto attached, shall then be and become the property of said parties of the first part; the intention being that said P. J. Sexton shall permit the said parties of the first part to continue said business now carried on at said No. 105 Madison street, with his goods and property, at their own risk, cost and expense; but that the said P. J. Sexton shall not be concerned in the management or ownership of said business, but only in the property used therein and the profits arising therefrom.

" And in case said profits shall amount to the sum of five thousand three hundred and eighty-six dollars and sixty-five cents ($5,386.65) on or before the 22nd day of March, A. D. 1898, and said sum shall have been received by the said P. J. Sexton, then and in that case the said P. J. Sexton agrees to transfer, assign and turn over to the said parties of the first part the stock, goods, merchandise and accounts receivable then on hand being used in said business at said No. 105 Madison street.

" In witness whereof we have hereunto set our hands and seals this 23rd day of September, A. D. 1896.

A. H. Blackall & Son,    [Seal.]
(Incorporated.)
A. H. Blackall,    [Seal.]
L. M. Blackall,    [Seal.]
Edward S. Blackall.    [Seal.] "

Schedule B referred to in the agreement and attached to the bill shows the total assets of the company to be $4,196.30, consisting of stock in trade worth $1,462.84, fixtures, $1,342.75 and bills receivable, $1,390.75.

The bill shows further that appellee allowed the company and the Blackalls to retain the property mentioned in Schedule B and to carry on said tea and coffee business at the store, 105 Madison street; that since the making of the agreement only $200 had been paid to appellee on the indebtedness, and there remained due him $5,186.65; that the Blackalls had removed part of the property mentioned in Schedule B, and had not paid over the accrued profits nor made any statement showing the condition of the business as provided in the agreement; that on July 15, 1897, it was verbally agreed between appellee, the company and the Blackalls that one Rose Gifford, the bookkeeper of the company, should have and keep custody of all the property mentioned in the written agreement, take all cash received in the business and turn it over to appellee, who should pay the necessary bills and carry on the business; that pursuant to such verbal agreement Gifford was placed in charge and possession of the store and business and had the keys of the store; that July 20, 1897, appellant entered the store and demanded possession of the property therein, which possession was given him by A. H. Blackall; that appellant and

Blackall took forcible possession of the store and property and compelled Gifford to leave and give up the same; that appellant was in possession and carrying on said business; that though often requested, the company and the Blackalls refused to carry out their agreement with appellee or pay him anything, and he was wholly excluded from possession or control of the property; that any rights which the company or the Blackalls had in the property had been forfeited, but were subject to redemption; that appellee did not know the full nature of the claim of appellant who had taken possession by virtue of some mortgage; that he was informed and believed that appellant was acting in collusion with the Blackalls under a pretended mortgage issued by the company to the defendant Gascoigne, dated April 30, 1897, with intent to hinder, delay and defraud appellee, which mortgage purported to convey all the coffee, machinery, bills and all other property and fixtures at 105 Madison street and also the stock of merchandise there; also five horses and certain delivery wagons.

The bill further alleged that if appellant or Gascoigne acquired any interest in the property, it was subject to the rights of appellee under his agreement; that the company and the Blackalls were wholly insolvent; that said property taken by appellant was of much less value than the amount due appellee and could not be sold for much cash, but the business if properly managed by a good and responsible person might be made to produce considerable profit; that appellant and the Blackalls were proceeding to sell and dispose of the goods at 105 Madison street, and to collect the debts and moneys; and that a receiver should be appointed.

The bill prayed for an investigation of appellant's mortgage, and that the same, if found fraudulent, be set aside and held subject to appellee's rights; that appellee's agreement be enforced and an account be taken and the company and the Blackalls decreed to pay appellee whatever sum might be found due; that in default thereof the property be sold to satisfy appellee's claim; that a receiver be ap-

Martin v. Sexton.

pointed and injunction issued.   There was the usual prayer for general relief.

On July 30, 1897, an amended and supplemental bill was filed, which among other things alleged that Rose Gifford pursuant to said verbal agreement took possession of said store, property and business for appellee and continued to hold such possession until appellant wrongfully dispossessed her, and that afterwards said company and E. S. and A. H. Blackall together with appellant took possession of said premises and proceeded to dispose of the goods, merchandise and chattels therein, and to appropriate to their own use the proceeds thereof, and to convert the same so that appellee would be deprived thereof; that there was no valid consideration for the chattel mortgage to Gascoigne, and all the proceedings were had for the purpose of hindering, delaying and defrauding appellee; that his claim of $5,386.65 was for money fraudulently appropriated, having been collected by E. S. Blackall as agent for appellee; that the company and the Blackalls without appellee's knowledge used the money or part of it for the purchase of the stock, good will and fixtures of said business at 105 Madison street from the Chicago Title & Trust Company; that said agreement was made to secure appellee for moneys collected by E. S. Blackall and wrongfully appropriated by said parties; that in order to deprive appellee of the profits of said business and of his rights under said agreement, the company, the Blackalls and appellant wrongfully conspired to take possession of the store, goods and property and to convert the same to their own use and prevent appellee from getting anything out of the same; that in pursuance of such purpose the mortgage was executed and possession taken by appellant, who had removed from said store four sacks of coffee and taken into his possession and converted $124, proceeds of said business; that every dollar which had been put into the business at 105 Madison street was appellee's money or the proceeds thereof; that the company, the Blackalls and appellant are still jointly interested in the said property and business.

Subsequently, the defendants answered the bill. Appellant's answer was filed December 29, 1897, alleging that appellee's agreement of September 23, 1896, was without consideration and fraudulent and void as to appellant; denying that any agreement was made to place Rose Gifford in possession of the property or that there ever was any indication that she had taken possession; and alleging that the company had control and possession of the property at the time appellant took possession. The answer alleged further that February 26, 1897, a lease was made by the Freer Estate, of said premises, 105 Madison street, to appellant, from May 1, 1897, to April 30, 1898, at a rental of $375 per month in advance; that at the time of the execution of the lease the company was in possession of said premises; that about April 30, 1897, appellant made an arrangement with the company by which it was to remain in possession, upon the agreement to pay him rent at $375 per month in advance; that no written lease was executed, it being understood that the company should occupy the premises and carry on the business and should buy its teas and coffees or the greater part thereof from appellant; that to secure the payment of this rent the company executed and delivered to Gascoigne, trustee for appellant, on April 30, 1897, a chattel mortgage on all the merchandise, machinery and fixtures at 105 Madison street, which having been acknowledged was recorded May 7, 1897; that, subsequently, appellant sold and delivered to the company a considerable quantity of merchandise and on July 20, 1897, it owed him for merchandise $884.25, for money loaned $750, for rent due $403.84, total $2,038.10; that on July 20, 1897, appellant and Gascoigne, trustee, feeling insecure and fearing diminution, removal or waste of the property, caused Buechel, as agent for Gascoigne and appellant, to take possession of the property under the mortgage and foreclose the same as authorized by the terms thereof; that July 21, 1897, Buechel with the written consent of the company sold the property described in the mortgage to appellant for $2,000 and executed to him a bill of sale of the property

Martin v. Sexton.

dated on that day; that on the same day appellant obtained from the company a bill of sale to himself covering all the property mentioned and described in the mortgage; that the bill of sale was delivered to appellant in consideration of the surrender and release of his claim of $2,038.10 against the company; whereupon appellant became the owner of the property; that the mortgage was given and foreclosed and the bill of sale executed and delivered without fraud or collusion and for the sole purpose on appellant's part of securing his claim against the company. The defendant, Gascoigne, answered to the same effect. On January 6, 1898, appellant filed an amendment to his answer setting up among other things that appellee had an adequate and complete remedy at law against appellant. When at issue, the cause was referred to a master to take proofs and report the same with his conclusions. In his first report he found among other things that E. S. Blackall, acting as agent for appellee, collected rents for him amounting to about $5,000 which were turned over to the company and used in its business; that this was the consideration of the agreement of September 22, 1896; that February 26, 1897, appellant obtained a lease from the Freer Estate of the premises where the business was carried on from May 1, 1897, to April 30, 1898, at $375 per month, payable in advance, and appellant made a verbal lease to the company covering the same period and for the same rent, but the company was to pay him, appellant, in weekly installments, to wit, for three weeks of the month $86.54 and for the fourth week $115.38; that April 30, 1897, the company gave a mortgage to Gascoigne, trustee, for $4,500 which was acknowledged and recorded to secure the monthly rental of $375; that July 20, 1897, there was due appellant for rent $86.54; that on the same day appellant demanded possession from Rose Gifford, who claimed to be in possession under appellee, and ousted her; that on the next day the company gave to appellant a written consent to immediate sale, without notice, under the mortgage, and Gascoigne, trustee, by Buechel, agent, executed a bill of sale to appellant under the mort-

gage, in consideration of $2,000; that on the same day the company in consideration of $2,000 sold the same goods to appellant and gave him a bill of sale therefor. The master stated that he did not go into the question whether there was an understanding between appellant and the Blackalls that the property purchased by him should be used to satisfy him, and then turned back to the Blackalls, for the reason that appellee's claim only covered the property in the store and not the good will, and inasmuch as appellant held the lease he could put appellee out at any time.

The master found further that on July 20, 1897, Gifford was in possession for appellee, of which fact appellant had notice; that there were no visible signs of the change of ownership and hence if the mortgage under which possession was taken was valid it would be a lien on the property to the extent of the amount due appellant, to wit, $86.54; that the mortgage to Gascoigne which on its face purported to secure an indebtedness to Gascoigne, trustee, of $4,500, was in fact given to secure the rent of $375 a month beginning May 1, 1897, and was only an indebtedness to the extent to which the rent would accrue from month to month, and would be no lien on any of the property until the amount was actually due; that inasmuch as the mortgage did not show on its face that Gascoigne was trustee for appellant, Gascoigne was the only man who had a right to take possession, and as Gascoigne was not in the city when appellant instructed the constable to take possession, the possession was unauthorized and constituted a trespass on the part of appellant. The master held further that appellant had notice at and before the time he took possession that appellee claimed possession through Gifford and therefore appellant had no right to seize the property even if the mortgage was valid. The master stated that he disregarded the question as to the value of the good will of the business as in his opinion appellee had nothing to do with it under his agreement; that his ownership was limited to the goods and fixtures. The master fixed the value of the stock at $1,080 and the value of the fixtures at $1,242.75,

Martin v. Sexton.

and recommended a decree in favor of appellee against appellant for the aggregate amount, with interest from July 20, 1897, at five per cent. per annum.

To this report both parties filed objections and exceptions; appellee in his objections claiming that he was entitled to the possession and control of the store at 105 Madison street on and after July 20, 1897, for the purpose of conducting the business and out of the profits thereof paying himself the sum of money due him from the company; that he, appellee, was entitled to an accounting from appellant for profits made by the latter in the conduct of said business after July 20, 1897, and to a decree against appellant for a sufficient sum out of said profits to cover the amount due appellee from the company together with interest thereon; that appellee under said agreement of September 22, 1896, had an interest in the good will of said business and had a right, on July 20, 1897, and thereafter, as against appellant to occupy said store and premises, 105 Madison street.

On June 17, 1901, the court entered an interlocutory decree sustaining appellee's exceptions to the report of the master but approving the same in all other respects. The court found among other things that it was agreed between appellee and the company that he should take possession of the premises at 105 Madison street and the stock of goods and fixtures, run and operate the business and apply the profits arising therefrom to his debt of $5,386.65; that thereupon he took possession and operated the business under the written agreement of September 23, 1896, and the verbal agreement until July 20, 1898, when appellant claiming to be entitled to the property under his chattel mortgage forcibly took possession of the premises and property and ousted appellee and his agents, and thereafter conducted the tea and coffee business in the premises; that after the seizure by appellant the company and the Blackalls made a bill of sale to him for the consideration of $2,038.10; that because at the time the mortgage was executed and at the time of appellant's taking possession

thereunder the company was not indebted to Gascoigne, trustee, the mortgage, although given to secure the rent, did not truly set up its purpose and was void for uncertainty, and that appellant had no right to seize the property; that at the time he seized the same there was due to him from the company for rent the sum of $86.54 only; that the sale from the company to appellant for $2,038.10 was collusive and fraudulent and was intended by appellant and the Blackalls to be only a conditional sale and that the company should retain a secret interest in the property which should be subsequently turned back by appellant to the company and to the Blackalls or some of them, and was made with the intent to defraud appellee and to prevent him from collecting his claim; that appellant obtained no title by virtue of the bill of sale; that at the time of the seizure by appellant, appellee was entitled to the possession of the premises and conduct of the business for the purpose of operating the same and paying his claim from its profits, or at his option to sell the property for the purpose of paying his debt; that appellee was entitled to recover the value of the stock and fixtures with interest and was also entitled to an accounting of the profits realized by appellant in the conduct of the business from July 20, 1897, to April 30, 1898, and out of such profits to recover from appellant the balance remaining due appellee after giving credit to appellant for the value of the stock and fixtures. The case was referred to the master to take such an accounting.

Upon the coming in of the master's second report the court found that appellant's total receipts out of the business until April 30, 1898, were $12,296.23 and total expenditures $9,391.81, leaving a balance of $2,898.42; that because appellant was conducting the business without right and as a trespasser he was not entitled to any credit for his services and that such credit claimed by him should be disallowed; that appellee's total debt was $5,186.65 with interest at five per cent. from September 23, 1896, making a total of $6,595.51; that appellee was entitled to recover from appellant $2,422.75, being the fair cash value of the stock

Martin v. Sexton.

of goods, fixtures, etc., at 105 Madison street, on July 20, 1897, seized by appellant; also, $2,898.42, being the net profits realized by appellant in the conduct of the store prior to April 30, 1898; also, interest at five per cent. on these two sums from April 30, 1898, to the date of the decree, amounting to $1,038. The court entered a decree against appellant for the sum of $6,359.17, from which this appeal is taken.

Musgrave, Vroman & Lee, for appellant.

Lackner, Butz & Miller, for appellee.

Mr. Justice Stein delivered the opinion of the court.

*First.* Appellee's title to the relief granted him rests upon the agreement of September 22, 1897, the seizure and prosecution of the tea and coffee business by appellant and the profits made by him therein. That business belonged to the company; and if, as counsel contend, no consideration moved to it for the execution of the agreement or if the same was invalid as to it for any other reason, then appellee's case fails.

The undisputed facts in this connection are that for some years before the summer of 1894, A. H. Blackall & Son, a partnership composed of A. H. and E. S. Blackall (father and son), carried on a tea and coffee business at 105 Madison street, Chicago. In the summer of 1894 the firm becoming involved made an assignment. The assignee managed the business for some months and sold it December 24, 1894. On that date the corporation A. H. Blackall & Son, organized a short time before " to engage in the purchase and sale of teas, coffees and spices of all kinds and to engage in a general mercantile business," acquired the furniture, put in a stock of goods and began business at the old stand. The stock of the corporation was held by A. H. Blackall, E. S. Blackall and Lillie M. Blackall, a daughter of A. H. and a sister of E. S. The three were the directors of the company, A. H. was its president, and Lillie M. its secretary and treasurer. All three participated actively in the management of the company's business.

The indebtedness of $5,386.65 mentioned in the agreement as being due appellee from the Blackalls and the company was for rents which A. H. and E. S. Blackall had been appointed by appellee to collect for him and which they or one of them had so collected and put into the company's business. The Blackalls, its officers and directors, knew this and they knew also that the moneys so collected were used by the company in its business and to develop the same. The company therefore became liable for the moneys to appellee and there was a valid consideration for its entering into the written agreement, notwithstanding the fact that without appellee's knowing it the moneys were credited to E. S. Blackall on the company's books, and that all sums paid him for services as manager or for any other purpose were charged up against his account. Appellee had no knowledge of the misappropriation of his rents and no control of the books or the way in which they were kept. The agreement signed by the company was in the nature of a chattel mortgage, and we know of no reason why, after it had appropriated and obtained the benefit of appellee's money without his knowledge or consent, it did not have power and authority to do what plainly was its duty, to wit, agree to repay the money and give security for its repayment, even though no formal resolutions to that effect had been passed by its board of directors. All the directors and officers knew of the making of the agreement and consented thereto. The agreement, although neither acknowledged nor recorded, and although it gave the company the right to retain possession of the property and sell the stock in the usual course of business, was nevertheless good as between the parties to it, and as between them the provision as to after-acquired property was valid. As to third parties having no prior lien, it was good after possession taken. Frank v. Mines, 50 Ill. 444; Barchard v. Cohn, 157 Ill. 579; Borden v. Croak, 131 Ill. 68; First Nat'l Bank v. Barse Commission Co., 198 Ill. 232; Gifford v. Wilson, 18 Ill. App. 214.

We are of the opinion that under the written agreement

and the implications arising therefrom appellee was entitled to the possession and operation of the business for the purpose of appropriating the profits to the payment of his claim.   But at any rate, the court correctly found that the written and the verbal agreements gave him an option either to sell the property (having seized the same) for the purpose of paying his debt, or to continue the business and apply the profits to his claim.   So also the court found correctly from the evidence that by the verbal agreement of July 15, 1897, appellee had the right to carry on the business until his claim should be satisfied out of its profits.

· *Second.*   Assuming for the present that the mortgage to Gascoigne under which appellant took possession and dispossessed Rose Gifford who was holding possession for appellee, was valid, the question arises whether appellee's possession was sufficient as against appellant.   If it was not, the decree cannot be sustained.

Instead of paying appellee all the profits of the business, (except $200 a month) as they had agreed to do, the Blackalls had paid him only $200 from September 22, 1896, to July 15, 1897, although the profits amounted to a very much larger sum.   From time to time appellee had threatened to take possession.   Finally, on the last named day, his patience was exhausted and he was about to put in charge a man of his own choosing when one of the Blackalls suggested that he select Miss Gifford, who had been in their employ as a bookkeeper for some five months and was competent to run the place, and that she should turn over the profits to appellee.   To this he assented; whereupon she was informed of the agreement that had been reached and that she was to take and keep possession and control of the premises and business for appellee, collect and disburse all moneys, direct the management of the business and report to him.   Accordingly, Miss Gifford assumed control of the business, reorganized the restaurant part of it, told the manager of the restaurant to report to her, took charge of the cash, paid bills, deposited in bank, and refused to let young Blackall check out any money,

and reported all these matters to appellee and acted under his orders and directions. He himself visited the store every day until it was seized by appellant, consulted with Miss Gifford in her private office, looked over the accounts, and gave directions concerning the business. Of all these facts a clear preponderance of the evidence shows appellant to have had notice before his seizure, and he admits appellee told him he had a bill of sale; and although the signs were not changed and the same books of account were used and there was no outward indication of a change in the possession, yet we think that there was a sufficient change as against appellant who had actual notice of the facts. There is no magic in a sign. Its object is to give notice, and this appellant had. He had further notice when he made his seizure and was resisted by Miss Gifford. The question that is raised is not so much as to appellee's actual possession, but as to the notoriety of it. In Best v. Fuller, 185 Ill. 43, cited by counsel for appellant, the court say (p. 51): "Besides, the primary question is, was there in fact a change of possession?" And in Read v. Wilson, 22 Ill. 377, which was a contest between a mortgagee and an execution creditor, it was held that a transfer of possession had been accomplished although the signs of the mortgagors were permitted to remain and the mortgagors themselves assisted the mortgagee in selling the goods.

Appellant's intrusion upon the premises and his seizure of the business was unauthorized for another reason. The chattel mortgage under which he claims, runs from the company to "James B. Gascoigne, trustee," (without indicating for whom, if anybody, Gascoigne is trustee), recites an indebtedness to him of $4,500, and provides that if the company shall pay said Gascoigne, "his executors, administrators or assigns, said sum of $4,500 on or before May 1, 1898, then this mortgage to be void." The company was not indebted to Gascoigne in any sum whatever. He was an entire stranger to the transaction and had no interest in it. So far as appears he did not even know that the mortgage had been given. Under these circumstances the mort-

gage was null and void as against appellee. The word " trustee," inserted after the name of the mortgagee, was of no effect and mere *descriptio personœ*. The real object of the mortgage was, as has been stated, to secure appellant against his contingent liability for rent; but of this nothing appears on its face. It purports to secure the payment of the $4,500 due Gascoigne and nothing else. Considering the manner in which it was drawn, no one was under any obligation to call upon and inquire of Gascoigne what relation he sustained to the instrument or whom he was trustee for; but even had such inquiry been made, he could have given no information.

The evidence strongly tends to show, and both the chancellor and the master found, that the sale under the mortgage to appellant and the sale to him by the company of the same property were parts of one transaction and pursuant to a fraudulent understanding that the sale, apparently absolute, should be conditional only, and that the Blackalls or the company should retain a secret interest in the property and finally have it back. One day after appellant took possession the company gave him a written consent to an immediate sale under the mortgage without notice, and on the same day one Buechel, undertaking to act for Gascoigne, (who took no part in the transaction,) executed a bill of sale to appellant under the mortgage in consideration of $2,000, and on the same day the company gave him a bill of sale for the same goods in consideration of $2,000, being something less than the sum which appellant claimed the company owed him. Both bills of sale were given pursuant to an understanding to that effect between appellant and the company. If there was an actual sale, which the proof leaves doubtful, it was in lump. It appears further that in connection with the execution of the bills of sale appellant told the three Blackalls that he " would pull them through " their difficulties; that he would protect them in their property rights; that afterwards the Blackalls applied to him to get the property back, and he said he could not do anything as long as the litigation was pending. At the last

interview between them he claimed that the Blackalls were still owing him money on account of the old partnership of A. H. Blackall & Son and that he intended to get that debt before he turned back the property.

A sign twenty-five feet long with the name of "A. H. Blackall & Son" covering the whole of it remained over the door of the premises for more than three years after appellant took possession. Above the sign was one about one and one-half to two feet long, bearing the name "N. Martin, successor." During all this time appellant continued to use wrapping paper and packages bearing the name of A. H. Blackall & Son.

We therefore concur in the finding of the court that the sale to appellant was conditional only and made with intent to defraud appellee and prevent him from collecting his claim, and that appellant obtained no title under either bill of sale.

*Third.* It is contended that the bill contains no allegations forming a basis for that part of the decree which holds appellant accountable for the profits made by him out of the business, and that inasmuch as he made nearly all these profits after the filing of the bill a supplemental bill should have been filed. Undoubtedly, proofs without allegations are as insufficient as allegations without proofs. But we think the allegations in this behalf are sufficient. In the original bill it is averred that appellant "was then in possession carrying on the business;" that appellee "was wholly excluded from the possession or control of the property;" that appellant "and the Blackalls were proceeding to sell and dispose of the goods at 105 Madison street and to collect the debts and moneys." In an amended and supplemental bill filed seven days after the original one it was charged that "said E. S. and A. H. Blackall and said A. H. Blackall & Son, after the said Rose Gifford was dispossessed as aforesaid, together with said Nicholas Martin (appellant), took possession of said premises and proceeded to dispose of the goods, merchandise and chattels therein and to appropriate to their own use the proceeds thereof;"

that appellant and the Blackalls "wrongfully conspired to take possession of the store, goods and property and convert the same to their own use and prevent Sexton from getting anything out of the same; that in pursuance of such purpose the mortgage was executed and possession taken by Martin;" that Martin had "removed from 105 Madison street four large sacks of coffee and taken into his possession and converted $124, the proceeds of said business." It is true that the prayer of the bill asks for no specific relief against appellant with reference to the profits; but the general prayer would be sufficient if the allegations are. Pennsylvania Co. v. Bond, 99 Ill. App. 536, contains an extended review of the authorities relating to the necessity of filing supplemental bills, and it is there held that where no new facts have arisen since the filing of the bill except that the defendant afterwards continued to do what the bill alleged he was doing and about to do, a supplemental bill is unnecessary.   That case governs the one at bar.

The state of the record justifies the inference that both before the master and the chancellor, the learned counsel for appellant considered the pleadings sufficient to authorize an inquiry into the profits made by appellant.   They made no objection to the inquiry or to the taking of testimony in that regard at any stage of the proceedings, and the only exceptions to the master's report finding the amount of the profits, were "that the profits  *  *  * amounted to $2,898.42" and that appellant's claim for services in managing the business had been disallowed. The objection that the pleadings do not support the decree is made in this court for the first time.

*Fourth.*   It is also claimed that under the allegations of the bill appellant was a mere trespasser upon the rights of appellee, and that as to him appellee had a complete remedy at law by an action of assumpsit or trover.   Appellee, being entitled to an accounting for the profits, had a right to proceed in equity; but even if that feature be disregarded, the objection founded upon the existence of a remedy at law came too late.   "This objection should be taken

at the earliest opportunity." Stout v. Cook, 41 Ill. 447, 448. It should be interposed before the filing of an answer. Magee v. Magee, 51 Ill. 500, 503; Kaufman v. Wiener, 169 Ill. 596. Appellant was served with summons July 28, 1897, and the summons was returnable at the August term of that year. He did not demur to the bill as he should have done in order to raise the objection in time. His answer filed December 29, 1897, is silent on the subject. He makes the objection for the first time in an amendment to his answer, filed January 6, 1898.

*Fifth.* Appellant made a verbal lease of the premises to the company for one year from May 1, 1897, the rent to be paid weekly. There was no agreement against subletting or assignment. This lease was in force at the time appellee took possession, and he was entitled to remain in possession as against appellant upon payment to him of the rent as it accrued. This results from the fact that the company gave appellee the right to occupy the premises, continue the business therein, and appropriate the profits' till he paid off his claim. The chancellor did not err in holding that appellant had no right to oust appellee from the premises during the year provided the rent were paid, and was liable to him for the profits made by appellant during the continuance of the verbal lease.

The decree of the Superior Court is affirmed.

*Affirmed.*